# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6172 | **DATE** | 3/21/2003 |
| **CASE TITLE** | GEORGE WEILAND vs. LINEAR CONSTRUCTION LTD. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Opinion And Order. Pursuant to sec. 1132(g)(2)(C), Linear and JJM are also jointly and severally liable to Plaintiffs for an additional amount equal to the greater of liquidated damages provided for under the Principal Agreement or interest on the unpaid contributions. Plaintiffs may submit additional written argument as to this issue within fourteen days, and defendants may submit a written response thereto within twenty-one days of the date of entry of this order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | Document Number |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | MAR 2 4 2003 | | |
| ✓ | Docketing to mail notices. | | date docketed | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| LG | courtroom deputy's initials | | date mailed notice | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GEORGE WEILAND, as Trustee, )
STRUCTURAL IRONWORKERS )
LOCAL NO. 1 PENSION TRUST )
FUND, and LOCAL UNION NO. 1 )
IRON WORKERS ANNUITY FUND, )
)    Case No. 00 C 6172
Plaintiffs, )
)    Hon. John W. Darrah
)
v. )
)
LINEAR CONSTRUCTION LTD. and )
JJM CONSTRUCTION, INC., )
)
Defendants. )

**DOCKETED**

MAR 2 4 2003

## OPINION AND ORDER

### INTRODUCTION

Plaintiffs, the Structural Iron Workers Local Union No. 1 Pension Trust Fund and the

Structural Iron Workers Local Union No. 1 Annuity Fund, which are employee benefit plans within

the meaning of the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(1), (2);

and George Weiland, a Trustee of the Funds (collectively "Plaintiffs"), filed a single-count amended

complaint against Defendants, Linear Construction Ltd. and JJM Construction, Inc. (collectively

"Defendants"), to collect unpaid contributions, interest, liquidated damages, and audit fees owing

to the Funds from December 3, 1999 to the present pursuant to an agreement executed between the

parties. Linear Construction Ltd. ("Linear") raised the defense of fraud in the execution. Defendants

also claim that JJM Construction, Inc. ("JJM") performed some of the work alleged to be the basis

of Plaintiffs' claim and that JJM is a separate corporate entity not bound by the agreement and that,

-1-

therefore, JJM is not obligated for payment to Plaintiffs. Plaintiffs claim that JJM is the "alter ego" of Linear and that the work is subject to the agreement. Defendants also claim that some of the work that Plaintiffs allege as the basis of the unpaid contributions was not "covered work" under the collective bargaining agreement.

There was a trial by the Court without a jury on the issues; testimony from several witnesses was heard over two days.

For the reasons discussed below, judgment is entered in favor of the Plaintiffs and against the Defendants.

Pursuant to Federal Rule of Civil Procedure 52, the Court hereby enters the following written Findings of Fact and Conclusions of Law which are based upon consideration of all the admissible evidence as well as this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be considered Findings of Fact, they shall also be deemed Findings of Fact.

## FINDINGS OF FACT

The Structural Iron Workers Local Union No. 1 ("Local 1") has entered into successive collective bargaining agreements ("CBA/Principal Agreement") with the Associated Steel Erectors of Chicago, Illinois ("the Association"), an association of employers engaged in the structural iron working industry. At all relevant times, Local 1 has been the sole and exclusive bargaining representative of iron worker employees employed by contractors that are members of the Association and also contractors that execute written compliance agreements, agreeing to be bound to the CBA.

-2-

The Local Structural Iron Workers Local Union No. 1 Fund Disbursement Office ("IWFDO") is established by the CBA/Principal Agreement and is a third-party thereto. Steve Bukovac ("Bukovac") is the administrator of the IWFDO. As the IWFDO administrator, Bukovac is duly authorized to collect employer contributions owed to the IWFDO Funds. Bukovac is also authorized on behalf of Local 1 to collect amounts which have been, or are required to be, withheld from the wages of employees for transmittal to Local 1 in payment of its Working Assessment and to the Political Action League. One of his duties as administrator is to collect contributions from signatory employers and ensure that the contributions are allocated into the correct accounts. He also initiates audits of employers to ascertain compliance with their contribution obligations under the CBA/Principal Agreement.

George Weiland ("Weiland") is a Trustee of the Structural Iron Workers Local Union No. 1 Pension Trust Fund ("the Pension Fund") and the Structural Iron Workers Local Union No. 1 Annuity Fund ("the Annuity Fund"). As Trustee of the Pension and Annuity Funds, Weiland is duly authorized to collect employer contributions owed to: the Structural Iron Workers Local Union No. 1 Welfare Fund; the Structural Iron Workers Local Union No. 1 Pension Trust Fund; the Apprentice & Journeyman's Retraining Fund; the MidAmerica Pension Fund; the Associated Steel Erectors Industry Promotion Fund; the NIA Training & Journeymen Upgrading Fund; the Institute of the Ironworking Industry; Local No. 1 Building Fund; Chicagoland Construction Safety Council; the Structural Iron Worker Local Union No. 1 Annuity Fund; and the Scholarship Fund ("the IWFDO Funds").

Lincar and JJM are engaged in, among other things, the erection and installation of pre-engineered steel buildings.

-3-

## Fraud in the Execution

Linear and JJM have been employers engaged in commerce within the meaning of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and ERISA. Linear operates out of the home of David Moravec ("Moravec") at 3703 Rose Anne Court, Wonder Lake, Illinois.

Moravec is Linear's sole shareholder and serves as an officer of the corporation. Moravec's formal education is limited to completing high school. Moravec has been a construction worker for fourteen years and has operated at least two construction companies during this period of time. Prior to his operation of Linear, Moravec was a partner in three other construction businesses for which he was responsible for bidding on and negotiating contracts in the pre-engineered self-storage building business. Linear and Moravec were not signatories of any type of agreement with a labor organization prior to December 1999.

Since its inception, Linear has performed the erection of pre-engineered self-storage buildings and the installation of the lockers in the buildings. Self-storage buildings are built in a patented way and are only fabricated by steel companies that make steel specifically for these buildings.

Linear was contracted by its construction broker, SS-20, to provide the labor to erect a self-storage building at 2525 West Armitage ("the Armitage Project"), beginning in November 1999 and continuing through February 18, 2000. In late November 1999, Linear was ordered by the general contractor, G.A. Johnson, to stop work on the Armitage Project because Local 1 had threatened to picket the site. Shortly prior to December 3, 1999, a meeting was held at the Armitage Project job site with Moravec; Brian Kingsbury ("Kingsbury"), a Local 1 union organizer; and Rich Bartuce, G.A. Johnson's representative. During that meeting, Bartuce stated that G.A. Johnson needed to

-4-

resolve the union labor issue so that Linear could complete the Armitage Project.

During that meeting, Kingsbury proposed that he might agree to allow Linear to use a composite crew, whereby Union members work alongside employees of a nonsignatory employer, consisting of three of Linear's current employees and three Iron Workers from Local 1's hiring hall. Kingsbury also indicated that Linear's current employees could work under the Local 1 CBA/Principal Agreement by obtaining a permit from Local 1's union hall. Under the permit, Linear would have to pay the Local 1 wage scale as well as fringe benefits to the Funds for all of Linear's union and non-union employees. At the time of the Armitage Project, the hourly package for Local 1 Iron Workers, consisting of the wage rate and fringe benefits, was $42.21 per hour.

Moravec told Bartuce that he was concerned about Linear's budget due to the fact that it would be completing the job with the union wage scale and with employees with whom he had not worked. Bartuce asked Moravec to calculate how much more it would cost Linear to use union labor on the remainder of the Armitage Project. Moravec calculated the additional cost of the Armitage Project using the union wage scale provided to him by Kingsbury.

Moravec submitted the new bid with his calculation of the additional cost of providing union labor on the Armitage Project, amounting to $58,948, which was accepted by G.A. Johnson; and the sum was paid directly to Linear.

On December 3, 1999, Bartuce, Moravec, and Kingsbury met a second time at the Armitage Project job site. They agreed that Linear would finish the Armitage Project with the composite crew and would pay union wages and benefits to all employees on the project. Moravec felt that a serious concern of those at the meeting was the fact that no work had been performed on the Armitage Project, and there were difficulties in erecting a steel and block building in the winter.

At the second meeting, Kingsbury gave Moravec a copy of the CBA/Principal Agreement, the wage and welfare bond form, the Funds' monthly reporting forms for hours and contributions, and copies of the Local 1 Compliance Agreement ("Compliance Agreement"). Moravec signed his name as President of "Linear Construction II, Inc." ("Linear II") on two copies of the Compliance Agreement. Moravec used the name Linear II instead of Linear because he thought that he needed a different company on the Compliance Agreement in order to avoid binding Linear to the union agreements. Although the Compliance Agreement identifies Linear II as the signatory employer, Linear II was never formed or incorporated at that time and still does not exist. Furthermore, Linear's equipment and employees were used to complete the Armitage Project along with Local 1 Iron Workers.

Prior to his execution of the Compliance Agreements, Moravec expressed concerns regarding the legal consequences of entering into a CBA with Local 1. He knew that an employer could not "work union and non-union" under a CBA. He had negotiated a $59,000 change order with the general contractor to cover the increased costs of union labor. He made no notation on the Compliance Agreement to indicate that the Compliance Agreement was limited to only the Armitage Project or that Linear agreed to the Compliance Agreement with a "project only" limitation, and there is no other written evidence of any agreement to limit the Compliance Agreement to the Armitage Project.

Moreover, on or about December 6, 1999, despite the absence of any provision in the Compliance Agreement requiring proof of insurance, Linear submitted to Local 1 a Certificate of Insurance, which identified Local 1 as the certificate holder, as evidence of Linear's compliance with the insurance requirements under Section 33 of the CBA/Principal Agreement. On January 12, 2000,

Linear, through its insurer, submitted to the Local 1 office a copy of an executed Wage and Fringe Benefit Bond in the amount of $50,000 for coverage of five or more Iron Workers, as evidence of Linear's compliance with the bond requirement under Section 33 of the Principal Agreement, despite the absence of any provision in the Compliance Agreement requiring proof of a bond. The reporting forms submitted by Linear state that Linear "agrees to make all contributions as provided in the collective bargaining agreement between Associated Steel Erectors of Chicago and Bridge, Structural & Reinforcing Iron Workers, Local Union No. 1."

Moravec completed monthly reports himself for the months of December 1999 and January and February 2000 and submitted them on behalf of Linear to the Funds Disbursement Office in accordance with the Principal Agreement. Each of the monthly reports identified the number of hours worked by each employee on the Armitage Project and the amount of fringe benefits due for those hours. Moravec certified that Linear paid all of its Local 1 and non-union employees' gross wages based on the Local 1 journeymen wage scale for 1999-2000 ($27.85 per hour) and benefits of $14.36 per hour as mandated by the Principal Agreement. Prior to signing the Compliance Agreement, Moravec was aware of the fact that the Compliance Agreement would bind Linear to the Principal Agreement for a term extending beyond the duration of the Armitage Project.

During the Armitage Project, Moravec completed and submitted to the Fund office reporting forms indicating how many hours Linear employees, both non-Local 1 members and Local 1 members, worked on the Armitage Project and the amount of fringe benefits due. In completing the report for December 1999, Moravec called the Fund office and received assistance in filling out the form. Linear reported a total of 756 labor hours and paid the Fund office $11,515.75 in fringe benefit contributions and deductions for its employees working on the Armitage Project in December

-7-

1999. Linear reported a total of 831 labor hours and paid the Fund office $12,426.50 in fringe benefit contributions and deductions for its employees working on the Armitage Project in January 2000. Linear reported a total of 451 labor hours and paid the Fund office $6,937.77 in fringe benefit contributions and deductions for its employees working on the Armitage Project in February 2000. Moravec personally completed each of the monthly contribution reports that Linear submitted to the Fund office.

*JJM as the Alter Ego of Linear*

On July 27, 2000, Bukovac sent Moravec a letter notifying Moravec that the Funds were requesting an audit of Linear's payroll and related records. In August 2000, subsequent to the Funds' notice requesting an audit, Moravec's mother, Karen Moravec, incorporated JJM. Karen Moravec has no day-to-day responsibilities related to JJM and has never received any income from JJM. JJM stands for Jarret and Justin Moravec, Moravec's sons. Subsequently, in August 2000, Moravec began providing employees to the Hillside Project as JJM Construction. The same Linear employees who worked at the Armitage and Hillside Projects completed the Hillside Project as JJM employees.

JJM currently operates, and has always operated, out of Moravec's residence at 3703 Rose Anne Court, Wonder Lake, Illinois. JJM and Linear share the same phone and fax number. Moravec and his wife, Debbie, have the authority to sign checks for JJM. Moravec hires and fires employees for JJM and signs contracts on behalf of JJM. He also sets the wage rates for JJM's employees and completes the federal and state quarterly tax returns for JJM. JJM and Linear employ the same employees and perform the same type of pre-engineered steel projects mostly for the same contractors.

-8-

*Covered Work*

Pursuant to Paragraph 4 of the Compliance Agreement and Section 44 of the CBA/Principal Agreement, the CBA/Principal Agreement in effect at the time Linear entered into the Compliance Agreement expired effective May 31, 2000. The CBA/Principal Agreement was automatically renewed, pursuant to its evergreen clause, for a subsequent term from June 1, 2000 through May 31, 2003. In order to terminate the CBA/Principal Agreement before it was automatically renewed on June 1, 2000, written notice of termination had to be sent by Linear to Local 1 at least four months prior to May 31, 2000. Neither Linear nor JJM sent written notice of termination on or before January 31, 2001. The Compliance Agreements require written notice to Local 1 at least four months in advance of the termination date applicable to the CBA/Principal Agreement. Linear did not provide written notice of termination of the Compliance Agreement before or after May 31, 2000. The CBA/Principal Agreement defined covered work in terms of trade jurisdiction and geographic jurisdiction.

Section 2 of the CBA/Principal Agreement provides that covered work within the Iron Workers' trade jurisdiction includes the erection of pre-engineered metal buildings, which include self-storage locker buildings and self-storage lockers. In addition, covered work also includes the erection of "steel houses and buildings," "structural steel frames," "all storage rooms," and "steel floor decking, hanging ceiling, hangers, clips, brackets, flooring, floor construction, steel floor decking, [and] the domes." Contractors who are signatory with Iron Workers Local 1 regularly erect and install pre-engineered metal buildings, self-storage locker buildings and self-storage lockers with crews comprised of Iron Workers.

Section 3 of the Principal Agreement provides that:

The boundary lines of Local Union No. 1 consist of the following which have been mutually agreed to by the local unions surrounding same.

A. On the North, the Wisconsin State Line.

B. On the Northwest, from County Line on Route 53, follow Cook County Line to McHenry County, West on Kane County Line to Route 31, North on Route 31 to Route 14, Northwest on Route 14 to Route 47, Route 47 to the Wisconsin Line. Territories East of these Routes belong to Local Union No. 1.

C. On the West, Illinois Route 53 from Cook County Line along the Eastern City limits of Glen Ellyn; South to 31st Street, then east on 31st Street to the Eastern City limits of Downers Grove; South on Fairview Avenue onto Route 66, then East on 91st Street to Clarendon Hills Road; South on line with Clarendon Road to Cook County Line.

D. On the South, and Southwest, Will County Line.

E. On the Southeast, Indiana State Line.

(Pls.' Ex. 2, Agreement between the Assoc. Steel Erectors of Chicago, Illinois & the Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers Local Union No. 1 of Chicago, Ill. June 2000, § 3.)

Linear's work on the Armitage Project was completed on or about February 18, 2000. After Linear completed the Armitage Project, Linear began a project at 1920 Clybourn ("the Clybourn Project"). The Clybourn Project consisted of installation of self-storage lockers into an existing building. Linear did not make any contributions to the Funds for the Clybourn Project or to any other project after the Armitage Project. Neither Moravec nor Linear has received any Reporting forms at any time after February 2000.

Despite Moravec's claim that Linear stopped performing work covered under Local 1's trade jurisdiction, the evidence clearly established that Linear continued to perform the same work on pre-engineered steel projects as described in the subcontract in the Armitage Project. The evidence demonstrated that both Linear and JJM performed covered work after the Armitage Project ended

-10-

in February 2000.

*Damages*

Damages from both Defendants are based on the amounts calculated by the Funds' auditors as the total sum due for unpaid contributions, deductions, liquidated damages, interest, and audit fees for covered hours of employees of Linear and JJM from December 1999 through May 2002. Liquidated damages in an amount up to 15% of the delinquent amount are recoverable under the 1997 Principal Agreement. Liquidated damages in an amount up to 20% of the delinquent amount are recoverable under the 2000 Principal Agreement.

The audits of Linear and JJM that form the basis of this litigation are for a period from December 1, 1999 through May 31, 2001. The general purpose of these audits was to determine the accuracy of the employee hours reported to the Funds by examining documents related to the number of hours worked by each employee.

In September 2000, Moravec received a letter from the Funds' auditors, Piotrowski & Gebis, requesting that he produce payroll registers or individual earning records for Linear which detailed actual hours of work and hourly rates. Other than the general ledgers that he generated from his computer, Moravec refused to provide any other primary source documentation to the auditors that would have allowed verification of the actual hours worked by Linear employees on the Armitage Project as well as subsequent covered work performed by Linear.

Subsequently, the Funds' auditors also requested an audit of JJM payroll records. Linear and JJM failed to produce any documentation that indicated where a particular employee or subcontracted individual worked during any given week or whether a particular job was within or outside the Local 1 territorial jurisdiction. Linear and JJM failed to produce any time sheets by job

-11-

or documentation of the material costs associated with any particular job involving covered work performed by Linear or JJM within the Local 1 territorial jurisdiction. The Funds' auditors reviewed documents provided by Linear and JJM in order to assess the amount of contributions owed to the Funds.

Linear did not pay its non-Local 1 employees the union-negotiated wage of $27.85 per hour, despite the fact that Moravec listed that rate on the Fund reports as the hourly wage received by all Linear's employees.

According to the description of Linear's subcontract in the Armitage Project, the work to be performed included the installation of metal panels, tube steel columns, mezzanine for first and second floors, all floor and roof beams, roof decking, floor and roof angles, masonry fasteners for columns and beams that attach to masonry, elevator hoist and separator beams, and roof hatch.

"Job costing" documents include data concerning where hours are worked. An auditor will use such documents to eliminate all hours falling outside Local 1's geographic jurisdiction. However, despite the fact that the auditor deemed such documents to be "really important" for the audit, no such documents were ever requested or received. The auditors assumed that all of the hours reported were within Local 1's geographic jurisdiction and included them in the final reports.

The following hours recorded on jobs performed by Linear were erroneously included in the final reports:

(1) The New Halls Ferry Project was performed in St. Louis, Missouri, which is outside the geographic jurisdiction of the Principal Agreement. The New Halls Ferry Project involved 956.49 hours of work and wages totaling $26,637.29.

(2) The Wilson SS-20 Project was performed in St. Louis, Missouri, which is outside the geographic jurisdiction of the Principal Agreement. The Wilson SS-20 Project involved 1,808.88 hours of work and wages totaling $27,313.50.

-12-

The following hours recorded on jobs performed by JJM were erroneously included by the auditors in the final reports:

>    (1) The Lenexa Project was performed in Kansas, which falls outside the geographic jurisdiction of the Principal Agreement. The Lenexa Project involved 3,710.9 hours of work and wages totaling $111,327.50.

>    (2) The Stockton Project was performed near Rockford, Illinois, which falls outside the geographic jurisdiction of the Principal Agreement. The Stockton Project involved 128.56 hours of work and wages totaling $3,857.00.

>    (3) The Wilson Project was performed in St. Louis, Missouri, which falls outside the geographic jurisdiction of the Principal Agreement. The Wilson Project involved 48.8 hours of work and wages totaling $1,464.00.

A total of 6,653.63 hours were erroneously included in the auditors' final reports for Linear and JJM.

Therefore, the "unreported hours" owed to the Funds as reported in the auditors' final reports of 49,164.75 hours are reduced by 6,653.63 hours to 42,511.12 hours.

## CONCLUSIONS OF LAW

### *Admissibility*

At trial, Defendants objected to Plaintiffs' Exhibits 35 and 36, the Constitution of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, AFL-CIO and the General Working Rules of Iron Workers International, respectively, on the ground that these documents were not produced or identified by Plaintiffs during discovery. These documents were used at trial in connection with Bukovac's and Michael Hebda's testimony concerning the scope of covered work under the CBA/Principal Agreement.

Federal Rule of Civil Procedure 37(c) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior repsonse to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted

to use as evidence at trial . . . any information not so disclosed." The fundamental purpose of Rule 37 is to ensure that the merits of the case can be addressed at trial without any party suffering prejudice as a result of nonfeasance or malfeasance during discovery. *Centagon, Inc. v. Bd. of Dirs. of 1212 Lake Shore Drive Condominium Ass'n*, No. 00 C 1110, 2002 WL 356483, at *4 (N.D. Ill. Mar. 5, 2002). The failure to disclose must be unjustified and harmful in order to warrant exclusion of the evidence. *See Sherrod v. Lingle*, 223 F.3d 605, 612 (7th Cir. 2000).

The Court finds that these documents are admissible because Defendants have not been prejudiced by their nondisclosure. These documents were included in drafts of the Final Pretrial Order ("PTO") exchanged with Defendants before the PTO was filed on August 16, 2002. Defendants did not request copies of these documents when the PTO was being prepared or filed. The documents were given to Defendants with the JJM Audit Report on September 11, 2002. Moreover, Defendants chose not to depose Hebda although they were given an opportunity to do so. Therefore, Plaintiffs' Exhibits 35 and 36 are admitted into evidence.

### Fraud in the Execution

ERISA provides that:

> [e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145 (2002). Defendants have asserted that any and all collective bargaining agreements to which Plaintiffs seek to bind them are void *ab initio* because Moravec's signature was procured through fraud in the execution.

Defendants also contended that Kingsbury had authority to limit their obligations under the

Compliance Agreement and the CBA/Principal Agreement. Specifically, Defendants argued that Kingsbury's actions prove that they were not signatories to the CBA/Principal Agreement. "[T]he party seeking to prove that an employee is a union agent must show that the union 'instigated, authorized, solicited, ratified, condoned, or adopted" the employee's actions or statements. . . . the party seeking to hold the Union responsible for an employee's conduct based upon the theory of apparent authority must show that the union cloaked the employee with sufficient authority to create a perception among the rank-and-file that the employee acts on behalf of the union . . . and that the union did not disavow or repudiate the employee's statements or actions." *Kitchen Fresh, Inc. v. NLRB*, 716 F.2d 351, 354 (6th Cir. 1983). At no time was Kingsbury ever actually authorized to act as an agent on behalf of the Funds during his discussions and negotiations on behalf of Local 1 with Linear and/or Moravec regarding the Compliance Agreement and the Principal Agreement nor was Kingsbury ever given such apparent authority. Any purported side agreement or oral understanding that may have arguably existed between Linear and Kingsbury does not alter the expressed provisions of the Compliance Agreement and the Principal Agreement, which clearly set out Linear's obligations to submit monthly reports and pay all due and owing contributions.

The Seventh Circuit has recognized fraud in the execution as a defense in lawsuits by funds for delinquent contributions. *Laborers' Pension Fund v. A&C Envtl., Inc.*, 301 F.3d 768, 779 (7th Cir. 2002.) "'Fraud in the execution' . . . entails deceiving a party to an agreement as to the very nature of the instrument it signs so that the party 'actually does not know what he is signing, or does not intend to enter into a contract at all.'" *A&C Envtl.*, 301 F.3d at 779 (quoting *Rosenthal v. Great W. Fin. Sec. Corp.*, 926 P.2d 1061, 1073 (Cal. 1996)). If there is fraud in the execution, the agreement is void *ab initio*, as though it never existed, and has never had any legal effect. *A&C*

*Envtl.*, 301 F.3d at 779. To establish fraud in the execution, a party must demonstrate that (1) "it did not know that it was signing a collective bargaining agreement that obligated it to make contributions to the Funds" and (2) "its ignorance was excusable because it had reasonably relied upon the representations of the union representative." *A&C Envtl.*, 301 F.3d at 780.

The Court concludes that Moravec was aware that the Compliance Agreements bound Defendants to the CBA and that any ignorance on Moravec's part was inexcusable. Moravec's conduct immediately prior to, and at the time of, his execution of the Compliance Agreements established that he knew that the Compliance Agreement would bind Linear to the Principal Agreement for a term extending beyond the duration of the Armitage Project. Moravec signed the Compliance Agreement as "Linear II Construction, Inc.," a non-existent company, in an obvious attempt to avoid Linear from being obligated to the clearly binding terms of the disclosed CBA/Principal Agreement. There was a clear and direct link between the Compliance Agreement and the CBA/Principal Agreement. Paragraph 2 of the Compliance Agreement expressly states that "[t]he Employer agrees to adopt, abide by and be bound by (a) all the terms and provisions of the collective bargaining agreement (hereinafter called the "Principal Agreement") entered into by and between the Union and the Associated Steel Erectors of Chicago." (Pls.' Ex. 3, Compliance Agreement ¶ 2.)

Moravec was provided with a copy of the CBA/Principal Agreement before he signed the Compliance Agreement. That Moravec is only a high school graduate also does not establish that there was fraud in the execution. Moravec was a "representative of [Linear] with the power to enter into contracts for the company. [Moravec] ought to have known not to sign something on behalf of the company without reading it first." *A&C Envtl.*, 301 F.3d at 781 (citing *Hill v. Gateway 2000*,

*Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997) ("A contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome.")). Linear accepted the terms and obligations under the CBA/Principal Agreement as a result of Moravec's execution of the Compliance Agreement and his agreement thereunder to "adopt, abide by and be bound by" all terms and provisions of the CBA/Principal Agreement. Linear's compliance with the terms and provisions of the CBA/Principal Agreement during the Armitage Project established its acceptance of, and intent to be bound by, all terms and provisions of the Principal Agreement with Local 1.

Linear failed to establish fraud in the execution of the Compliance Agreement. There was no evidence at trial to support a finding that any ignorance of the fact that the Compliance Agreement bound Linear to the Principal Agreement beyond the duration of the Armitage Project was reasonable or excusable.

### JJM as the Alter Ego of Linear

A corporation is deemed to be the alter ego of another where the evidence establishes "'the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets.'" *Int'l Union of Operating Eng'rs, Local 150 v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir. 1987) (quoting *Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 24 (1st Cir. 1983)). An alter ego relationship exists where there is "'substantially identical business purposes, equipment, type of customers, actual joint day-to-day operations'"; "'active concert or participation [between the employers] in a scheme or plan of evasion'"; or "interrelation of operations, centralized control of labor relations, common management, and common ownership or financial control." *Central States, Southeast & Southwest Areas Pension Fund v. Sloan*, 902 F.2d 593, 596-97 (7th Cir. 1990) (quoting

-17-

*NLRB v. Dane County Dairy*, 795 F.2d 1313, 1321 (7th Cir. 1986)). "An alter ego's liability is the same as the liability of the alleged corporation." *Central States, Southeast & Southwest Areas Pension Fund v. Miss. Warehouse Corp.*, 853 F. Supp. 1053, 1058 (N.D. Ill. 1994).

Proof of an alter ego relationship between the Defendants was established by the evidence of the interrelated business operations, employees, and management of Linear and JJM, as well as the sham transfer of assets when Linear attempted to transfer all pre-engineered steel and self-storage projects to JJM to avoid its duties under the Principal Agreement. As the alter ego of Linear, JJM is liable to the Funds for all amounts owed by Linear. JJM engaged in covered work in Local 1's geographic jurisdiction subsequent to its formation in July 2000. JJM's failure to pay the Funds the requisite contributions is a violation of the Compliance Agreement, the Principal Agreement, the Trust Agreement, and ERISA.

### Damages – Failure to Pay for Covered Work

From December 6, 1999 through May 31, 2000, Linear was bound to the Principal Agreement in effect from June 1997 through May 31, 2000. Since June 1, 2000, Linear has been bound to the renewed Principal Agreement in effect from June 1, 2000 through May 31, 2003. At all times during the period of December 6, 1999 through the present, Linear's obligations under the Principal Agreement included a duty to pay contributions to the Funds on behalf of each employee that it provided, or was required to employ, for covered work within the Local 1 geographic jurisdiction. Covered work under the Principal Agreement included all pre-engineered self-storage locker and building work performed by Linear and/or JJM within Local 1's geographic jurisdiction.

Linear breached the Principal Agreement by failing to report and to pay contributions due and owing for covered work under the Principal Agreement with respect to construction projects within

the Local 1 geographic jurisdiction subsequent to February 2000. At no time has either the Funds or Local 1 waived or relinquished its rights under the Principal Agreement with respect to Linear, and neither the Funds nor Local 1 has received written notice of termination of the Principal Agreement from Linear. The Funds, as the third-party beneficiaries under the Principal Agreement, are entitled to enforce the terms of the Principal Agreement related to Linear's obligations to pay due and owing contributions for covered work.

Under ERISA, if

judgment in favor of the plan is awarded, the court shall award the plan –
(A) the unpaid contributions,
(B) interest on the unpaid contributions,
(C) an amount equal to the greater of –
(i) interest on the unpaid contributions, or
(ii) liquidated damages provided for under the plan not in excess of 20 percent [of the unpaid contributions],
(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
(E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2).

Linear and JJM each had an obligation under ERISA to maintain adequate substantive documentation of the number of hours of covered work performed by his employees in order to permit a determination of the amount of contributions due to the Funds. To dispute an auditor's findings, an employer must "present evidence of the precise number of hours of covered work performed by his employees or evidence to negate the reasonableness of the inference to be drawn from the Fund's evidence." *Ill. Conference of Teamsters & Employers Welfare Fund v. Steve Gilbert Trucking*, 953 F. Supp. 1026, 1032-33 (C.D. Ill. 1997). As discussed in the Findings of Fact, Defendants, through Moravec's testimony at trial and the general ledgers of Linear and JJM, have

met this evidentiary burden as to only the work that was performed outside the geographic jurisdiction of the CBA/Principal Agreement. That work must be excluded as a basis for determining the amount of contributions due the Funds.

Linear and JJM, as Linear's alter ego, breached the Principal Agreement with Local 1 and are jointly and severally liable to Plaintiffs, pursuant to the CBA/Principal Agreement, the Trust Agreements and the applicable federal statutes, for the following amounts: $106,929.38 in delinquent contributions on behalf of Linear, $441,788.22 in delinquent contributions on behalf of JJM, $9,745.00 in audit fees, and reasonable attorney's fees and costs to be determined pursuant to 29 U.S.C. § 1132(g)(2)(D).

Pursuant to § 1132(g)(2)(C), Linear and JJM are also jointly and severally liable to Plaintiffs for an additional amount equal to the greater of liquidated damages provided for under the Principal Agreement or interest on the unpaid contributions. Plaintiffs may submit additional written argument as to this issue within fourteen days, and Defendants may submit a written response thereto within twenty-one days of the date of entry of this order.

John W. Darrah, Judge
United States District Court

Date: March 21, 2003

-20-